UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No. 16 CR 561 |
| | ) | |
| DANIEL GONZALEZ-MUNGUIA | ) | The Hon. Sara L. Ellis |

**<u>GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS</u>**

The UNITED STATES OF AMERICA, by its attorney, ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, respectfully recommends that the Court sentence defendant Daniel Gonzalez-Munguia to a term of imprisonment above the applicable advisory Sentencing Guidelines range. For this case, the Government recommends that Gonzalez receive a sentence of 240 months' imprisonment. The Government recognizes a recommendation of 240 months' imprisonment is significantly above the advisory Guidelines range; however, such a sentence is warranted because for years, defendant imported drugs into the United States knowing and intending that the drugs would kill his customers. He profited off of death, and his sentence must reflect the seriousness of his conduct.

## I. Introduction

Daniel Gonzalez-Munguia should serve significant punishment for his drug offenses. For almost ten years, Gonzalez profited from the misery of extremely vulnerable people. Taking a product meant for veterinary use, pentobarbital, Gonzalez preyed upon despondent, depressed, suicidal individuals who paid hundreds of dollars per bottle, to be able to kill themselves. Even after shipments were interdicted by law enforcement, and well after he was made aware of the harm his conduct was causing, Gonzalez continued to sell this dangerous drug, even concealing the pentobarbital in packaging made to look like cosmetics. With each sale, defendant knew the

drug would cause death or substantial bodily injury to the end user. And, as discussed in the plea agreement, Government's Version of the Offense, and the criminal complaint, many victims died as a result of Gonzalez's illegal drug sales. Because defendant took steps to conceal his activities, including by using encrypted email, his exact number of customers are not known, nor are the total number of individuals who died as a result of the drugs he imported – but what remains clear is that Gonzalez intended for his customers to die when he sold them a Schedule II controlled substance.

For his multi-year victimization of vulnerable individuals, including some who were less than 18 years old, Gonzalez must be punished by a significant term of imprisonment. Here, that is a sentence of 240 months' imprisonment, the statutory maximum sentence possible for his conviction on importation of a Schedule II controlled substance.

## II. The Presentence Investigation Report's Factual Recital and Guidelines Estimates Are Correct.

The Presentence Investigation Report correctly states the facts concerning defendant's offenses. PSR, ¶11-26.

The PSR is correct that, if the drug quantity involved is limited to 2,258 bottles, Gonzalez falls at Level 27. *Id.*, ¶36. The PSR is also correct that Gonzalez should receive a two-level enhancement for using an online interactive service, § 2D1.1.(b)(7). PSR, ¶¶39-40. And the PSR is correct that Gonzalez should also receive a two-level enhancement for obstruction of justice, § 3C1.1. PSR, ¶¶43-44.

### A. Drug Quantity

As stipulated in the plea agreement, between approximately September 2018 and April 2021, after receiving directions from Individual A, Individual B mailed approximately 1,029 parcels from a Los Angeles area post office to customers in various countries, including many in

2

the United States. Each parcel typically contained two 100 milliliters of pentobarbital.[1] Therefore, using two as the number of bottles that were typically shipped, Gonzalez utilized Individuals A and B to ship at least 2,058 bottles of pentobarbital using the Postal Service between September 2018 and April 2021.[2] PSR, ¶36. Probation factors in an additional approximately 200 bottles sold between 2012-2018. PSR, ¶36.

In addition to the 2,058 bottles shipped from September 2018 and April 2021, another 190 bottles were also recovered inside Individual B's home after he cooperated. These bottles had been sent to Individual B by defendant. Using only 2,058 bottles identified from the Postal database and adding the 190 bottles recovered in Individual B's Los Angeles home, one may conservatively conclude that Gonzalez distributed or intended to distribute at least 2,248 bottles, *i.e.*, 224,800 milliliters. Therefore, multiplying by 2, Gonzalez is responsible for at least 449,600 units, which falls at Level 26 (at least 400,000 units, but less than 700,000 units) – the same offense level as calculated by the Probation Office

Because defendant also agrees with the base offense level calculated by Probation, there is no dispute on quantity. *See* Def. Sent. Mem. at 25. Gonzalez will fall at Level 26, before any enhancements are added.

As discussed below, the drug quantity for purposes of the Guidelines undoubtedly

---

[1] The data was derived from a Postal database tracking shipments by Individual B, *i.e.*, 1,029 parcels. However, the sheets of the purchasers' names/addresses/drug quantities that Gonzalez emailed to Individual A, reflect that as few as one bottle or as many as four bottles were sometimes ordered by a purchaser.

[2] In the plea agreement, the Government took the position that, over a nine-year period, using the estimate of 2,058 bottles over a 30-month period, or 69 bottles per month, defendant is responsible for the importation and distribution of at least 7,452 bottles of pentobarbital, each of which contained 100 milliliters of the drug. Therefore, the government concluded that defendant fell at Level 30 and was responsible for at least 1,490,400 units of a Schedule II Depressant. In the defendant's version of the offense, page 5, he stated that while defendant thought that number might be inflated due to the extrapolation, he believed "a more accurate estimate would [still] result in the same offense level precipitated on drug quantity" as the government's calculation.

underrepresents the actual amount of drugs imported, as it only includes bottles from limited snapshots in time during the multi-year importation scheme.

> **B. Two-Level Increase for Distributing a Controlled Substance by Means of an Interactive Computer Service**

Gonzalez disputes the PSR's application of two levels for the use of an online interactive service, pursuant to § 2D1.1(B)(7). *See* Def. Sent. Mem. at 9. The mass-marketing enhancement applies where "defendant, or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct), distributed a controlled substance through mass-marketing by means of an interactive computer service." U.S.S.G. § 2D1.1(b)(7). The two-level enhancement should apply here.

As the PSR notes, Gonzalez used an online service to market narcotics, *i.e.*, the web-based group and forum Exit International. PSR, ¶40. Indeed, the first purchaser that law enforcement interviewed on March 18, 2016, SM, described how he paid for an online subscription for "The Peaceful Pill Handbook," which he described as essentially a "how to guide on committing suicide." The online manual contained a Yahoo! email address for Alejandro Vasquez, the alias used by Gonzalez in his drug business. The online manual identified Alejandro Vasquez as a source who could supply drugs to assist readers who wanted to kill themselves. SM ordered the pentobarbital and received an email from the Yahoo! account containing instructions on how to pay for the drug. The Yahoo! account provided him with a name and instructions to wire money to Mexico in order to obtain the pentobarbital. After SM used Western Union to wire approximately $644 to the contact in Mexico, SM received an email from the Yahoo! account that provided a tracking number for the parcel containing the pentobarbital. Without accessing the online portal of Exit International, SM could not have obtained the drug. The same is true of every other individual who bought the drug from Gonzalez. Indeed, they could not have reached

Gonzalez if they had not first contacted Exit International (or a similar forum) and acquired Gonzalez's contact information. For example, in the online Peaceful Pill Handbook, in a section entitled "Nembutal Over the Internet: Mexico," the author specifically identified a source of supply in Mexico named "Alejandro Vasquez" and provided a Yahoo! email address and an encrypted email address also used by "Alejandro Vasquez."[3] *See* Government's Version at 4.

The PSR correctly applies two-levels because Gonzalez clearly distributed a controlled substance by means of an interactive computer service: he used the website of Exit International to find customers who sought out his suicide drug. PSR, ¶¶14-15. In similar cases like *United States v. Ulbricht*, SDNY no. 14 CR 68 (the Silk Road website), or *United States v. Melgarejo and Gray*, EDNY no. 19 CR 586 a dark web narcotics website), courts applied the enhancement. The same enhancement applies equally in this case.

### C.     Two-Level Increase for Obstruction of Justice

Gonzalez is also subject to a two-level enhancement under §3C1.1 for obstructing and impeding the administration of justice with respect to the investigation. The PSR properly applies this enhancement. PSR, ¶43. As the PSR recounts, after SM met with law enforcement agents on March 18, 2016, SM contacted Gonzalez using the Yahoo! email address and warned him that law enforcement officers had visited him and confiscated the pentobarbital. PSR, ¶ 44. By this date, at the latest, defendant was aware of a criminal investigation surrounding the pentobarbital he imported into the country. However, defendant nevertheless continued to engage in his drug trafficking activities, warning customers, to destroy their email communications, the parcels, the bottles, and other evidence of the purchase of the pentobarbital. For example, in 2019, the victim identified in Count One of the superseding indictment, CS, told law enforcement that "Alejandro"

---

[3] Email evidence obtained during the investigation indicates that Gonzalez and the author/head of the group discussed since at least 2015 supplying pentobarbital to individuals who read the *Peaceful Pill eHandbook*.

told him to delete his emails. This instruction is consistent with the example found in the sale of products to "Sasha K," or "SK," to whom Gonzalez wrote the following in September 2015:

From: Alejandro Vasquez <alejandrovasquezmvz@yahoo.com.mx>
Sent: Monday, September 28, 2015 12:00 PM
To: Sasha K
Subject: Re: package sent Shachi

can remove the labels apart and burn them and the bottles break them or leave them like that, or break all.

deathankh73@gmail.com>escribió:
wrote:
wrote:

Other purchasers similarly recounted that they were told to destroy the emails, parcels, and bottles.

Gonzalez argues that his directions to delete emails or dispose of bottles was not "material" because there were "many other ways to track the conduct and sale" of the bottles. Materiality, for purposes of the obstruction enhancement, is evidence or information that "would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, App. Note 6. It does not matter if the evidence that Gonzalez instructed to be destroyed "actually affect the decision[s]" of law enforcement, the deletion of the evidence just had to be "capable of influencing" law enforcement in their investigations. *United States v. Grigsby*, 692 F.3d 778, 785 (7th Cir. 2012) (quotation omitted). Here, defendant took steps to conceal his identity as the importer of the drugs: using encrypted email, using alias names, utilizing a drop shipper, etc. Destroying his email communications with the customers, and/or destroying bottles which might provide evidence of the source of the bottles, may cause law enforcement to be unable to determine the source of the drugs, or at least frustrate and complicate their ability to locate the source. Those key pieces of evidence were "material" for purposes of this Guidelines enhancement.

Given Gonzalez's obstructive directives to his customers, the PSR is correct in adding two level under §3C1.1.

6

### D. Applicable Adjusted Guidelines Estimates

Therefore, the Government agrees with the PSR that Gonzalez falls at Level 30, calculated as follows.

| Base offense level | § 2D1.1(a)(5), (c)(7) | Drug quantity: at least 400,000, but less than 700,000 units of pentobarbital, a Schedule II depressant | +26 |
|---|---|---|---|
| Enhancement | § 2D1.1(b)(7) | Drug distribution by means of an interactive computer service | +2 |
| Enhancement | §3C1.1 | Obstruction of justice | +2 |

With no criminal history points, Gonzalez is in Criminal History Category I. PSR, ¶56. Accordingly, with an adjusted offense level of 27 and Criminal History Category I, Gonzalez faces an advisory Guidelines sentencing range of 70 to 87 months' imprisonment.

However, as explained below, Gonzalez should be sentenced above the applicable advisory Guidelines sentencing range. This is because the advisory Sentencing Guidelines offense level calculations simply do not take into account the deaths of those to whom Gonzalez sold controlled substances.

### III. The Section 3553(a) Factors Warrant an Above Guidelines Sentence for Defendant.

This is an extremely serious drug case where multiple deaths occurred, and defendant knew his drugs would be used to kill. Defendant is not charged with any counts that resulted in death or serious bodily injury. However, defendant's relevant conduct involved death or substantial bodily injury to several purchasers. The history and characteristics of the defendant, as well as the nature and seriousness of the offense, warrant an above-Guidelines sentence for this defendant.

### A. The History and Characteristics of the Defendant

Besides completing numerous educational courses while being incarcerated at the M.C.C., Gonzalez has submitted nothing in mitigation thus far or reported anything that might warrant

7

lesser punishment for what he did. His personal history and characteristics reflect a longstanding involvement in drug trafficking, which is especially troubling because of his commitment to selling drugs again and again, without any thought about stopping, even after he was made aware of the damage caused by his actions and the beginning of law enforcement interdictions in 2016.

Perhaps most troubling is the fact that, even when a mother of a victim contacted him to complain in February 2016 about his sales to vulnerable individuals, Gonzalez chose to steam forward with his drug dealing. Evidence of Gonzalez's willfulness is contained in one email in the Yahoo! account that stands out from the many, many other emails discussing how the purchasers found the source of supply.

On or about February 28, 2016, Gonzalez received the following email from a concerned mother located in Finland.

> Hello I am writing this because our daughter 25 years old has been trying to take her life 19 of January, but thank God I found out that she had bought a ro[p]e and did not succeed. She was taken to mental hospital and is in the treatment of deep depression but in these 2 weeks she could be some days home But now I am very worried because I found out that she had ordered pisabental and anti-emetics from you. trying to poison herself and this way to take her young life. Can you tell when did you send those bottles and do you think she already has them…

Gonzalez responded as follows.

> ***I am very worried and ashamed for what happened,*** let me explain how this works: the only way a person can contact me is by an organization based in Australia named Exit International. All the persons have to sign and agree some terms, of course you must be on legal age, I didn't know your child was a minor age. I sent her some product on January 2 but the package was detained by Finland customs. Please, receive my apologies and I hope [Individual BB] is ok, I send my prayers to her and all of your family.

*See* Government's Version at 10 (italics added). At this point, February 2016, there could be no way that Gonzalez did not know he was selling drugs to individuals for use in their deaths. Yet, merely a month later, in March 2016, he proceeded to sell two bottles to SM in this District,

instructing him to delete his emails and not cooperate further with law enforcement.

Thereafter, over and over again, Gonzalez preyed upon those with issues or conditions, using their vulnerability to profit for himself. He took a veterinary product, marked it up by hundreds of dollars, and then sold it to some of the most vulnerable members of the community. All the while knowing that they would die after ingesting the drug.

Throughout his drug importation scheme, Gonzalez took no steps to determine whether his customers were truly terminally ill or otherwise seriously incapacitated. He did not refer them to mental health services, nor did he ask why they wanted the drug or try to talk them out of taking the drug. He did no due diligence. This was not a "service" – it was a money-making scheme profiting off those who were vulnerable and desperate.

Once law enforcement began to interdict the packages containing the drug, Gonzalez realized that he needed to protect his illicit trafficking better. He began to use an intermediary, Individual A, to drive the product across the U.S. border, so that Individual B could then store the drugs and drop-ship the packages to destinations across the world. To avoid any law enforcement scrutiny, Gonzalez kept from these assistants the nature of the product they were handling. Indeed, he removed the label from the veterinary bottles and masked them with a fake cosmetic label. He sold the bottle in a fake cosmetic box and added packaging to make it look like he was selling a natural cosmetic product. Put another way, even where there were places where he could have stopped his crimes, Gonzalez continued to move forward and sell the suicide drug.

Such offense conduct is the hallmark of a morally bankrupt individual. It is true that one can have views about assisted suicide. And, reasonable minds may differ in their approach to the difficult issues faced by society. However, when a person profits from the misery of others, and continues to do it, repeatedly, ignoring all warnings to stop, with reckless indifference to why the

9

customer was purchasing the drugs, that person is not worthy of much mitigation at sentencing. This case is not about an instance of a person seeking to help a family member who is suffering from an incurable disease that may result in significant pain. This is the case of a cold-blooded drug dealer seeking to put as much money in his pocket as possible without regard to the end-users, as exemplified by the fact that there appear to have been many victims dealing with mental health issues, including at least one 16-year-old victim.

For these personal history and characteristics, Gonzalez fits into the category of the rare defendant for whom a sentence at the highest end of statutory sentencing framework is applicable.

B.      The Nature and Circumstances of the Offense/The Seriousness of the Offense

As the PSR aptly notes, "[w]hat the offense level computations do not address is the death of persons to whom the defendant sold pentobarbital." Sent. Rec. at 2. Indeed, "[w]hile the users of the pentobarbital took the substance with the intent of to take their own lives, the loss of any human life is an abject tragedy, and the defendant facilitated the deaths of persons, including depressed individuals, seemingly for pecuniary gain." *Id*. Suffice it to say, the conduct here is unprecedented and truly abhorrent.

Consider this email in the Yahoo! account, from SK, a 26-year-old resident of Mount Prospect, Illinois, who, wrote Gonzalez on or about August 28, 2015, asking "Hello, I was thinking about purchasing the product.  I was wondering how much I will need for my body weight?  Do you think one bottle would be enough to kill me?  Or should I be safe and order two?  Thanks in advance."  That same day, Gonzalez responded, "For people who weigh less than 60 kilos 1 bottle should do the job… two bottles for the rest of the people and in some cases, for persons who weigh more than 120 kilos is better to have 3 bottles." A few days later, SK emailed an order for pentobarbital.  The emails indicate that, after successfully wiring money as instructed, SK was

10

provided with another email from the Yahoo! account showing a photograph of the parcel containing the pentobarbital. Western Union records shows that SK wired $558 to a currency exchange located in Puebla, Mexico, on September 1, 2015, and that an individual later picked up the money at the currency exchange. Thereafter, SK was found deceased on the evening of December 2, 2015, with a suicide note located near her body. According to the Cook County Medical Examiner, she died as a result of pentobarbital toxicity.

Countless others perished similarly using the drug supplied by this defendant. Indeed, after he began to enlarge his operations and use Individuals A and B to distribute the drugs, Gonzalez kept selling, including to several individuals who were all less than 30 years old at the time of death. *See* Ex. A (sealed). Among those unfortunate souls was a 16-year old boy in San Diego who consumed the drug, but fortunately did not die because his parents found him and contacted emergency services, resulting in a hospital stay.

The Guidelines in this case underreport the seriousness of the offense in two ways. First, they do not address in any way that death and serious injuries occurred repeatedly by Gonzalez's conduct. There is no enhancement or offense level adjustment related to death or injury. Secondly, as discussed above, the drug quantity attributable to defendant is understated by the Guidelines offense level based on quantity. Because defendant took steps to conceal his activities, the true amount of drugs imported is not known to law enforcement. However, there are years of drug importation activity that are not included in the offense calculation described above. Therefore, the Guidelines also underrepresent the seriousness of the offense because they do not adequately account for the full amount of imported drugs. An above-Guidelines sentence is justified because of the inadequacy of the Guidelines to account for the true seriousness of the offense.

C.      **The Need to Provide Just Punishment for the Offense and to Afford Adequate Deterrence to Criminal Conduct**

Other factors which support a Guideline sentence for defendant are the need to provide just punishment for the offense, and the need to afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(A), (2)(B).

Simply put, the crimes described above deserve punishment. Several family members of victims are expected to appear at defendant's sentencing hearing. Their stories, individual and collectively, cry out for justice. Once the Court hears from them or reads their respective victim impact statements, it will be clear that Gonzalez should be justly punished.

**D.** **Proposed Supervised Release Conditions**

Consistent with *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), as well as the above-described Section 3553(a) factors, the Government also requests that the Court impose the supervised release conditions recommended in the PSR. PSR, ¶109.

**IV.     Conclusion**

The Section 3553(a) factors counsel for a sentence above the applicable Guidelines sentencing range. For this case, a sentence of 240 months' imprisonment—the statutory maximum possible punishment--represents "a sentence sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). Therefore, the United States requests that this Court sentence defendant Daniel Gonzalez-Munguia to a term of imprisonment of 240 months, a term above the applicable advisory Guidelines sentencing range, to be followed by an appropriate period of supervised release.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By:     */s/ Kartik K. Raman*
        KARTIK K. RAMAN
        Assistant United States Attorney
        219 S. Dearborn Street, Fifth Floor
        Chicago, Illinois  60604
        (312) 469-6026
Dated: September 2, 2025     *kartik.k.raman@usdoj.gov*